IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| S.K., a minor, by and through her parents<br>and natural guardians, Roxanne J. King, and<br>Brian King<br><br>               Plaintiff,<br><br>vs.<br><br><br>School Board of Orange County, Florida,<br>Robert Cline,<br>John W. Mina, in his official capacity as<br>Sheriff of Orange County, Florida, and Aspire<br>Health Partners, Inc. f/k/a Lakeside Behavioral<br>Healthcare, Inc.<br>               Defendants.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    CASE NUMBER: |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff S.K., a minor child with special needs, by and through her parents and natural guardians jointly, Roxanne J. King and Brian King, who by and through the undersigned counsel, files this Complaint ("Complaint") against Defendants School Board of Orange County, Florida (hereinafter referred to as "School Board"), John W. Mina, in his official capacity as Sheriff of Orange County, Florida (hereinafter referred to as "Sheriff"), Robert Cline, individually, and Aspire Health Partners, Inc. f/k/a Lakeside Behavioral Healthcare, Inc.; and in support thereof states as such:

## INTRODUCTION

1. This is a civil action pursuant to 42 U.S.C. §1983 & §1988 seeking damages against Defendant Sheriff, through its agents and employees, for committing acts, under color of law, with the intent and for the purpose of depriving Plaintiff S.K. of rights secured under

the Constitution, laws of the United States, and laws of the State of Florida, and for refusing and/or neglecting to prevent such deprivations and denials to Plaintiff.

2. Additionally, this is an action seeking damages against School Board pursuant to Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. ("ADA"), as well as the regulations implementing the ADA, 28 C.F.R. Part 35.

3. Further, Plaintiff pleads causes of action sounding in negligence, negligent infliction of emotional distress, intentional infliction of emotional distress, and false imprisonment exceeding $75,000.00 in damages exclusive of attorney's fees, costs, and interest.

## PARTIES AND AGENTS

4. Plaintiff S.K. is a minor child and special needs student who, at all times relevant to this action, was nine years old, sixty-nine pounds, and under five feet tall, and attended Lovell Elementary School ("School") in Orange County, Florida.

5. Roxanne J. King and Brian King are S.K.'s parents and natural guardians and are bringing this action jointly on S.K.'s behalf.

6. Defendant School Board is a Florida Governmental Entity that is located at 445 W. Amelia St., Orlando, FL 32801.

7. Lovell Elementary School is a school operated, maintained, managed, and supervised by Defendant School Board.

8. Jennifer Rojas and Deborah Trent were employees and agents of Defendant School Board at all times material to this action.

9. Defendant Aspire Health Partners (known at the time as Lakeside Behavioral Healthcare; hereinafter sometimes referred to as "Aspire Health") is a business providing mental healthcare services for cost in Orange County, Florida, including but not limited to

counseling services on school campuses and involuntary mental health services pursuant to the Florida Mental Health Act, also known as the Baker Act.

10. Samantha Storch was an employee and agent of Defendant Aspire Health Partners (known at the time as Lakeside Behavioral Healthcare) at all times material to this action. Ms. Storch was providing services to S.K. at Lovell Elementary School since the beginning of the school year pursuant to S.K.'s Individual Education Plan ("IEP") to help S.K. earn strategies for responding to environmental stressors that are difficult for children with autism.

11. Defendant Sheriff is a Florida Governmental Entity that is located at 2500 West Colonial Dr., Orlando, FL 32804.

12. Robert Cline was an employee and agent of Defendant Sheriff at all times material to this action.

13. Jerry Demings was the Sheriff of Orange County, Florida at all times material to this action.

## JURISDICTION AND VENUE

14. Jurisdiction is proper in this matter pursuant to 28 U.S.C. 1331 and 1343.

15. Venue is proper in the Middle District of Florida, Orlando Division pursuant to 28 U.S.C. 1391(b)(1) and (b)(2). The actions complained of took place in this judicial district and all Defendants regularly and presently conduct affairs in this judicial district.

## FACTS

16. At all times material to this action, S.K. was diagnosed as having autism spectrum disorder and associated behavioral and emotional disabilities including separation anxiety and attention deficit and hyperactivity disorder ("ADHD"), which, as with any child with autism, are greatly affected by environmental circumstances.

17. At all times material to this action, S.K. was also subject to an IEP, which identified that she was diagnosed with Autism Disorder, ADHD, and Separation Anxiety Disorder.

18. At all times material to this action, S.K.'s IEP included a morning transition process to address the time period when S.K. would experience separation anxiety and sometimes have what the IEP characterized as "temper tantrums" as a result.

19. The transition plan set forth that S.K. would be walked to an empty classroom by her father and a school staff member before school started and would remain there with only an exceptional education teacher for approximately fifteen minutes to allow her time to calm down and decompress from her separation anxiety symptoms before that teacher would walk her to her assigned classroom to start school.

20. In March of 2017, S.K.'s doctor had made a change in her mediation which led to S.K. having several temper tantrums without injury to S.K. or others before school during her transition time.

21. In mid-March 2017, Aspire employee Samantha Storch called Mr. King and said that S.K. had a tantrum when he left and said she wanted to kill herself. Ms. Storch advised that Ms. Rojas had called the 2-1-1 mental health hotline and they were advised to discuss with the parents the option of a voluntary Baker Act.

22. Mr. King advised that he did not want to Baker Act S.K. because sometimes she made comments like that, as many children with autism do, without meaning it because she did not understand the significance of what she was saying and she had recently had a medication change that could be affecting her and that he would come to the school to pick S.K. up, which he did.

23. Between that date and March 30, 2017, S.K. did not cause harm to herself in any way and

continued to attend School as normal.

24. On March 30, 2017, S.K.'s father Brian King dropped S.K. off to the transition classroom as usual with a teacher named Deborah Trent.

25. During that timeframe, S.K.'s doctor readjusted her medication back to what it had been prior to the increased frequency of temper tantrums S.K. experienced in early March.

26. Shortly after leaving the School, Jennifer Rojas contacted the Kings and stated that S.K. was having a tantrum but that there was a standardized test that day at school that she wanted S.K. to take and therefore did not want the Kings to come pick S.K. up from school.

27. Ms. Rojas then told Mr. King that her husband was a police officer and that she suggested having Ms. Rojas call and get a sheriff's officer to come to the school to speak with S.K. to try to help her feel safe and calm her down.

28. Mr. King stated that he did not think it was a good idea to get law enforcement involved, especially considering that Ms. Storch had recently tried to get Mr. King to Baker Act S.K.

29. Ms. Rojas then told Mr. King that the officer would only talk to S.K. and that a police officer could not Baker Act S.K. without the parent's consent because she was only having a temper tantrum and was not making any statements that she wanted to do self-harm and that therefore there would be no basis for a Baker Act detention of S.K.

30. Ms. Rojas assured Mr. King that there would be no negative consequences to S.K. if he agreed to let Ms. Rojas call an officer to come to speak to S.K.

31. Relying on Ms. Rojas' statements and assurances, especially because she told him that her husband was a police officer, the Kings agreed to allow a police officer to speak to S.K. solely to try to get her to feel safe and therefore calm down so that she could take the standardized test as requested by Ms. Rojas.

5

32. Ms. Rojas requested an Orange County Sheriff's officer come to the School.

33. Orange County Sheriff's Officer Robert Cline arrived at the School and had an aggressive interaction with S.K., physically restraining her by grabbing her by her tiny arms, while three other adults surrounded the sixty-nine pound, nine-year-old S.K.

34. Officer Cline became angry when S.K. attempted to pull away and yelled.

35. Ms. Rojas texted Mrs. King and told her, "We called the non-emergency line" and asked Mrs. King if she wanted to return to the school.

36. Mr. and Mrs. King, who were together, immediately returned to the School campus.

37. Upon arriving at the School, Ms. Rojas told the Kings, "The officer is pissed."

38. Officer Cline then came out of the School to speak with the Kings.

39. Officer Cline was visibly irritated.

40. Mrs. King immediately told Officer Cline, as noted in Officer Cline's police report, that S.K. was on the autism spectrum and that she had ADHD and anxiety related to her autism.

41. Officer Cline responded in an angry tone and level of voice that he could charge the nine year old with a felony for the way she acted but that he was going to Baker Act her instead and that they should be grateful he was not charging her with a felony.

42. The Kings asked Officer Cline to let them take S.K. with them because she was not a threat to herself and had made no statements of self-harm that day and that she had autism, not a mental illness.

43. Officer Cline said that he was told by her counselor Ms. Storch (the employee of Defendant Aspire Health - the mental health detention center) that S.K. had made self-harm statements in the past.

44. Mrs. King told Officer Cline those statements were made weeks before and were caused

by a change in medication that her doctors had since reversed and that according to Ms. Rojas no such statements had been made by S.K. that day and Mrs. King again asked the officer to release S.K. to her parents and told him that he did not have their permission to take her.

45. Officer Cline told them, "I have the authority and I'm taking her."

46. Without permitting her parents to see or speak to her, Officer Cline put the sixty-nine pound, nine-year-old S.K. in the back of a police car, locked her inside and left her locked inside for a period of time, and then transported her to what was known at the time as Lakeside Behavioral Health Center (the "Mental Health Detention Center"), which was and is owned by Defendant Aspire Health Partners, Inc. f/k/a Lakeside Behavioral Healthcare, Inc., where Officer Cline initiated an involuntary Baker Act detention of the nine-year-old child with autism against her parent's wishes at approximately 9:30 am.

47. The Kings immediately went to the Mental Health Detention Center to request that their daughter be released.

48. The Kings were informed by staff at the Mental Health Detention Center that their nine-year-old could not be released until she was seen by a doctor since a police officer had initiated the Baker Act detention.

49. Over the next twenty-four hours, the Kings repeatedly called the Mental Health Detention Center requesting that their nine-year-old daughter be released.

50. Despite Florida law requiring that a minor who is detained pursuant to the Baker Act be seen and evaluated by a doctor within twelve hours of arrival, Defendant Aspire Health Partners, Inc. f/k/a Lakeside Behavioral Healthcare, Inc. did not have a doctor see and evaluate S.K. until more than twenty-four hours later.

51. The sixty-nine pound, nine-year-old S.K. was held overnight in the Mental Health Detention Center with mentally ill people.

52. The Kings called the morning of March 31, 2017 and demanded that their daughter be released or that they would make a police report for kidnapping.

53. It was only after that call that Defendant Aspire Health Partners, Inc. f/k/a Lakeside Behavioral Healthcare, Inc. finally had a doctor evaluate S.K. who determined that she was not a risk to herself and she was released after being held over twenty-four hours in the Mental Health Detention Center after Officer Cline initiated her Baker Act detention.

54. When the Kings were finally able to see their daughter after her release from the Mental Health Detention Center, Mrs. King observed bruises on S.K.'s arms and back and asked S.K. what had happened to cause them and S.K. told Mrs. King that Officer Cline had hurt her.

55. Mrs. King later discovered another bruise on S.K.'s buttocks, which was suffered either at School, in the police car, or at the Mental Health Detention Center since S.K. did not have the contusion prior to going to school that day.

56. The Kings took their daughter that day to Nemours Children's Urgent Care where multiple contusions were documented by medical staff and S.K. was treated for same.

57. The Kings went to Orange County Sheriff's Office that day to make a complaint about Officer Cline's actions.

58. While looking for where to enter the building, then-Sheriff Jerry Demings exited and the Kings showed Sheriff Demings the bruises on their daughter.

59. The Kings told then-Sheriff Demings an autism advocate they spoke to during S.K.'s involuntary detention told them that autism was not a mental illness, that mental illness is

a requirement under the statute for a Baker Act, and that therefore police were not supposed to Baker Act children with autism.

60. Demings responded, "That is correct.  That is not protocol."

61. Demings then went inside and got another officer to come out to speak with the Kings and Demings left.

62. Two officers, one male and one female, approached the Kings and S.K. and S.K. clung to her parents and said, "Are they going to hurt me too?"

63. The male officer said to S.K., "No honey.  We're here to help you."

64. The Kings showed the officers the child's bruises and then the officers told the Kings that they needed to come back Monday to make a complaint to internal affairs about the matter.

65. The Kings went back and made the report as instructed.

66. The Kings were later informed by a letter signed by then-Sheriff Demings that the Sheriff's investigation determined that Officer Cline did nothing wrong when he aggressively, physically detained their nine-year-old daughter to the point of leaving multiple bruises on her or when he detained the child with autism, not a mental illness, and had her further involuntarily detained in the Mental Health Detention Center.

67. S.K. has suffered physical and emotional damages as a result of the actions described above.

68. Plaintiff has satisfied all conditions precedent to bringing this lawsuit against Defendant Sheriff, including compliance with Section 768.28(6), Florida Statutes, and Plaintiff has exhausted all other applicable remedies.

69. Plaintiff has satisfied all conditions precedent to bringing this lawsuit against Defendant Cline, including compliance with Section 768.28(6), Florida Statutes.

70. Plaintiff has satisfied all conditions precedent to bringing this lawsuit against Defendant School Board, including compliance with Section 768.28(6), Florida Statutes, and Plaintiff has exhausted all other applicable remedies.

71. Plaintiff has satisfied all conditions precedent to bringing this lawsuit against Defendant Aspire Health Partners, Inc. f/k/a Lakeside Behavioral Healthcare, Inc., and Plaintiff has exhausted all other applicable remedies.

## COUNT I – NEGLIGENCE AS TO SCHOOL BOARD

72. Plaintiff adopts and incorporates paragraphs 1- 67 and 70 as though fully restated and alleged herein.

73. Defendant School Board owed S.K., a special needs student attending school under the custody, care, responsibility and compulsion of the School Board, a heightened duty of care as a child attending school at a location that the School Board operated, maintained, managed, and supervised at all times relevant to this action, and while acting in loco parentis.

74. Defendant School Board breached its duty of care to S.K. by  (1) failing to carry out and ensure adherence to its risk assessment policy and related policies governing intervention with students with autism, (2) failing to carry out and ensure adherence to IEP policies and plans, and (3) failing to carry out and ensure adherence to policies on how to properly engage with autistic children in conflict resolution and on what behaviors exacerbate behavioral responses in autistic children.

75. Defendant School Board further breached its duty of care to S.K. by failing to have a policy covering when requesting law enforcement intervention is appropriate for children   with autism and that requires staff who call for law enforcement intervention to provide all

relevant information on the child's developmental disabilities so as to not put the child at increased risk of improper law enforcement detentions.

76. Defendant School Board's breaches of duty owed to S.K. were the proximate cause of S.K.'s injuries and damages.

77. S.K. suffered emotional damages and physical injuries as a result of Defendant School Board's breach of its duty to S.K.

78. The actions of all governmental entity Defendants as alleged herein are "operational" level decision making activities. As such, none of the governmental entity Defendants are immune from tort liability stemming from these incidents and in accordance with Article X, Section 13 of the Florida Constitution, all governmental entity Defendants have waived sovereign immunity from liability in these torts.

### COUNT II – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AGAINST SCHOOL BOARD

79. Plaintiff adopts and incorporates paragraphs 1- 67 and 70 as though fully restated and alleged herein.

80. Defendant School Board's negligent conduct described in this Complaint hereinabove and incorporated into this Count caused severe emotional distress to an already emotionally fragile child S.K.

81. S.K. suffered physical impact and injury as described in this Complaint herein above inflicted and incorporated into this Count.

82. Defendants' actions and omissions caused such psychological trauma and emotional distress in the special needs child S.K. that she suffered and continues to suffer anxiety about the incidents that occurred and increased anxiety related to authority figures and attending school, which have required medication and therapy.

11

83. The actions of all governmental entity Defendants as alleged herein are "operational" level decision making activities. As such, none of the governmental entity Defendants are immune from tort liability stemming from these incidents and in accordance with Article X, Section 13 of the Florida Constitution, all governmental entity Defendants have waived sovereign immunity from liability in these torts.

## COUNT III - VIOLATION OF THE ADA BY SCHOOL BOARD

84. Plaintiff adopts and incorporates paragraphs 1 – 67 and 70 as though fully restated and alleged herein.

85. Title II of the Americans with Disabilities Act ("ADA") applies to state and local government entities, and, in subtitle A, protects qualified individuals with disabilities from discrimination on the basis of disability in services, programs, and activities provided by state and local government entities.

86. Title II extends the prohibition on discrimination established by section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. 794, to all activities of state and local governments regardless of whether these entities receive Federal financial assistance.

87. Defendant School Board knew, through their employees and agents, that S.K. suffered from a qualifying disability.

88. Defendant School Board, through its employees and agents, assumed a duty of care over S.K.

89. Defendant School Board, through its agents and employees, failed to accommodate S.K.'s disability when it failed to provide proper policies to and/or failed to carry out and ensure adherence to policies related to risk assessment and police intervention with children with developmental disabilities by its agents and employees who its assigned the duty of

providing care, custody, and control, over S.K. and other minor students with qualifying disabilities like S.K., which also had the effect of discriminating against S.K., and other children with development disabilities, by reason of her developmental disability and of causing her to be deprived of the services provided by the School Board, including attending classes and receiving an education, when she was detained.

90. Defendant School Board, through its agents and employees, further failed to accommodate S.K.'s disability when its agents failed to carry out and ensure adherence to policies related to accommodations, which also had the effect of discriminating against S.K., and other children with development disabilities, by reason of her developmental disability and of causing her to be deprived of the services provided by the School Board, including attending classes and receiving an education, when she was detained.

91. Defendant School Board, through its agents and employees, further failed to accommodate S.K.'s disability when they caused police intervention and physical detention of S.K.

92. Further, the policy or practice of the School Board of using police intervention with children with developmental disabilities had the effect of discriminating against S.K., and other children with development disabilities, by reason of her developmental disability and of causing her to be deprived of the services provided by the School Board, including attending classes and receiving an education, when she was detained.

93.  As a direct and proximate result of the Defendant School Board's conduct, S.K. suffered physical injury and has suffered embarrassment, humiliation, and psychological injury.

94.  As a direct and proximate result of the Defendant School Board's conduct and the prosecution of this civil litigation, Plaintiff has incurred and will incur attorneys' fees and litigation costs.

## COUNT IV - VIOLATION OF CIVIL RIGHTS
## PURSUANT TO 42 U. S. C. §1983 BY SHERIFF

95. Plaintiff adopts and incorporates paragraphs 1 - 69 as though fully restated and alleged herein.

96. Officer Cline, as an agent of Defendant Sheriff, who was a government actor, acting under the color of law, violated S.K.'s constitutional right to be free from unreasonable seizure when Cline detained S.K. without probable cause.

97. Defendant Sheriff, at all times material hereto was a government actor, acting under the color of law.

98. S.K.'s constitutional right described hereinabove above was clearly established as a matter of law at the time the restraint and deprivation occurred.

99. Defendant Sheriff contracted with the School Board to have an active presence of its officers on public school campuses in Orange County and actively sent his officers to those schools, including Lovell Elementary School, with the purpose of performing law enforcement functions on the school campuses, including the initiation of Baker Acts.

100. The Florida Mental Health Act, also known as the Baker Act, permits a law enforcement officer to detain and institute a further involuntary detention and examination of a person in a mental health facility who a law enforcement officer (1) believes to be mentally ill; (2) has determined that because of that mental illness the person has refused voluntary examination or cannot determine whether examination is necessary; (3) has determined that, without care or treatment, the person is either likely to suffer from neglect resulting in a real and present threat of substantial harm that cannot be avoided with the help of willing family members or friends, or is likely to cause serious bodily harm to himself or herself or others in the near future.

14

101.  At all times material, the Baker Act has required law enforcement to complete and submit a Report of Law Enforcement Officer Initiating Involuntary Examination and the information regarding Baker Acts of minors by law enforcement is tracked and reported annually by the Department of Children and Families (DCF).

102.  The DCF reports of Baker Acts of minors by law enforcement (the "Reports") are required by statute to be submitted to the leadership of the Florida legislature and they are published on the DCF website.

103.  According to the Reports, Baker Acts of minors from school property in Orange County by Sheriff's officers have increased drastically between 2013 and the date of the incidents that give rise to this lawsuit.

104.  Additionally, the rate of detentions of minors generally from schools by Orange County Sheriff's Officers has been one of the highest in the state during that same time period.

105.  Further, in 2016, 1 out of 68 children were diagnosed with autism.

106.  Therefore, the Sheriff had actual or constructive notice that its failure to have any policy for lawful execution of the Baker Act with regard to children or children with autism, including having no policy or guidelines that autism could not be the basis for a Baker Act detention, was highly predictable and plainly certain to result in a constitutional violation, and it consciously and deliberately chose to disregard the risk of harm.

107.  Despite having the information cited above, the Sheriff made the deliberate choice to follow a course of action from among various alternatives, which alternatives included instituting a policy and training on said policy that clarified to its officers that under no circumstances should a development disability, such as autism, be the reason for instituting a Baker Act, since Florida law specifically exclude developmental disabilities from the

definition of a mental illness, and that directed officers to alternatives when responding to persons with autism.

108.  In the instant case, S.K. did not have a mental illness. She was autistic, which was the cause of his behavioral responses to the School staff and Sheriff's Officer.

109.  The Sheriff's Officer had knowledge that S.K. was autistic and not mentally ill when he still had S.K. detained on School property and before he detained her in a locked police vehicle for a period of time, transported her to a Baker Act Mental Health Detention Center, and facilitated an involuntary mental health Baker Act detention of the child.

110.  At that point, the officer's actions did not meet the standard required for involuntary commitments as required by Florida law, and he therefore lacked probable cause to detain her for said purpose.

111.  S.K. was having a temper tantrum in a classroom with no other children in it but with four much larger adults, including a police officer, who were able to safely keep the child in that room throughout the tantrum.

112.  The nine-year old, sixty-nine pound child who was under five feet tall was not a real threat of harm to the four much larger adults, and especially not to the law enforcement officer.

113.  As such, there was no real and present threat of substantial harm to her well-being, or anyone else's, as is required by Florida law for an involuntary commitment.

114.  Additionally, S.K. had willing family members who asked to take custody of her who were experienced in taking care of and keeping S.K. safe when she had behavioral outbursts.

115.  The Sheriff's Officer did not ask S.K.'s parents if they would, on S.K.'s behalf, submit

S.K. to a voluntary examination and did not get such permission to do so.

116. Based on the foregoing, the Sheriff's Officer had no basis for reasonably believing, even arguably, that probable cause existed to restrain, arrest, and involuntary detain in a locked police vehicle and then via the Baker Act the tiny nine-year old child having a temper tantrum.

117. If that was a reasonably arguable standard, half the children in Florida could be Baker Acted at any given time.

118. Even after learning that S.K. was autistic and her behaviors were a result of her autism and not a mental illness, the officer facilitated the involuntary detention of the child in a locked police vehicle via the Baker Act despite having not even left the School property yet and having the alternative choice of releasing the child to the parents who were also on School property.

119. With the actual or constructive knowledge that (1) it was putting its law enforcement officers in daily contact with children, including those with developmental disabilities such as autism, (2) autism exists in high rates in children, (3) its officers were increasingly Baker Acting children at higher and higher rates each year according to its own reports to the State of Florida, the Sheriff's failure to have any policy for lawful execution of the Baker Act with regard to children and children with developmental disabilities, including having no policy or guidelines that trained officers that developmental disabilities, including autism, could not be the basis for a Baker Act detention was substantially certain to result in a constitutional violation.

120. Such failure amounts to a deliberate indifference to the rights of persons with whom the police, and specifically those police responding to school campuses, come into contact.

121. As a direct and proximate result of the violation of S.K.'s constitutional rights by the Defendant, Plaintiff suffered damages as alleged in this Complaint including but not limited to physical injury, and mental and emotional distress, and is entitled to relief under 42 U.S.C §1983.

122. The conduct of Defendant Sheriff of deliberate indifference described herein was of such a nature that punitive damages should be imposed in an amount commensurate with the wrongful acts alleged herein.

## COUNT V – FALSE IMPRISONMENT BY DEFENDANT SHERIFF

123. Plaintiff adopts and incorporates paragraphs 1 - 69 as though fully restated and alleged herein.

124. In Florida, false imprisonment is defined as the unlawful restraint of a person against his will.

125. The essential elements of a cause of action for false imprisonment are: (1) the unlawful detention and deprivation of liberty of a person; (2) against that person's will; (3) without legal authority or "color of authority"; and (4) which is unreasonable and unwarranted under the circumstances.

126. Defendant Sheriff, by way of his acting agent Cline, did detain and confine S.K. against her will in the back of his police car and facilitated and caused S.K.'s detention and confinement at a Mental Health Detention Center against her will and against the will of her parents and natural guardians.

127. The Sheriff's agent Cline acted without legal authority since he lacked probable cause.

128. The detainment and confinement of a special needs child, in the manner described above,

was unreasonable and unwarranted under any circumstances and certainly unreasonable and unwarranted in the case of an nine-year old, little girl with autism when that child (a) was not mentally ill, (b) posed no real and present threat of substantial harm to her well-being, and (c) when it was made abundantly clear to the officer that any such potential for harm or neglect could be avoided through the help of willing family members, her parents, who requested S.K. be released to them.

129. S.K. was aware of her confinement and was unable to escape without the threat of harm.

130. As a direct and proximate result of the Defendant's conduct, S.K. has suffered physical injury as well as embarrassment, humiliation, and psychological injury.

131. The actions of all governmental entity Defendants as alleged herein are "operational" level decision making activities. As such, none of the governmental entity Defendants are immune from tort liability stemming from these incidents and in accordance with Article X, Section 13 of the Florida Constitution, all governmental entity Defendants have waived sovereign immunity from liability in these torts.

## COUNT VI – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS BY SHERIFF

132. Plaintiff adopts and incorporates paragraphs 1 - 69 as though fully restated and alleged herein.

133. Defendant Sheriff's conduct, by way of his acting agent Cline, Demings, and other offices, as described in this Complaint hereinabove and incorporated into this Count inflicted and caused severe emotional distress to an already emotionally fragile child S.K.

134. S.K. suffered physical impact and injury as described in this Complaint herein above inflicted and incorporated into this Count.

135. Defendant's actions and omissions caused such psychological trauma and emotional

distress in the special needs child S.K. that she suffered and continues to suffer psychological trauma.

136. The actions of all governmental entity Defendants as alleged herein are "operational" level decision making activities. As such, none of the governmental entity Defendants are immune from tort liability stemming from these incidents and in accordance with Article X, Section 13 of the Florida Constitution, all governmental entity Defendants have waived sovereign immunity from liability in these torts.

**COUNT VII - 42 U.S.C. § 1983 - USE OF EXCESSIVE FORCE**
**BY DEFENDANT ROBERT CLINE IN VIOLATION OF THE FOURTH AMENDMENT**

137. Paragraphs 1- 69 are incorporated herein by reference.

138. The right to be free from excessive force during a seizure is clearly established. Poole v. City of Shreveport, 691 F.3d 624, 627 (5th Cir. 2012).

139. Claims that a police officer used excessive force are analyzed under the Fourth Amendment's "objective reasonableness" standard. Salvato v. Miley, 790 F.3d 1286, 1293 (11th Cir. 2015), citing Graham v. Connor, 490 U.S. 386, 388 (1989).

140. An objectively reasonable police officer would have known that (a) seizing S.K., (b) using force against S.K., (c) restricting S.K.'s movement, and (d) causing S.K.'s continued detention, would violate clearly established law.

141. Defendant Cline's actions violated clearly established constitutional rights of which a reasonable person would have known, that is, an objectively reasonable officer would have known that physically restraining with enough force to leave multiple, visible bruises, detaining in a locked police car, and then submitting to an involuntary Baker Act detention a nine year old little girl, who was sixty-nine pounds, and under five feet tall,

20

who did not have a mental illness but who had a developmental disorder, and who posed no threat of serious bodily harm to herself or others, and who did not present as a flight risk, violated clearly established state and federal law and violated the Fourth Amendment as a matter of law.

142. As a direct and proximate result of the Defendant's conduct, S.K. has suffered physical injury as well as embarrassment, humiliation, and psychological injury.

143. As a direct and proximate result of the Defendant's conduct and the prosecution of this civil litigation, Plaintiff has incurred and will incur attorneys' fees and litigation costs.

## COUNT VIII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BY DEFENDANT CLINE

144. Plaintiff adopts and incorporates paragraphs 1 – 69 as though fully restated and alleged herein.

145. Under Florida law, to state a cause of action for intentional infliction of emotional distress, a complaint must allege four elements: (1) deliberate or reckless infliction of mental suffering; (2) outrageous conduct; (3) the conduct caused the emotional distress; and (4) the distress was severe.

146. By detaining a nine-year old child with autism in a locked police car and further causing the child to be involuntarily detained overnight in a Mental Health Detention Center, Defendant Cline did deliberately or recklessly inflict mental suffering on S.K.

147. Defendant Cline's conduct as described herein, when S.K.'s parents were present and able to take the child and the child did not have a mental illness and did not pose a serious threat to herself or others, was outrageous and caused S.K. severe emotional distress.

148. As a direct and proximate result of the Defendants' conduct, S.K. has suffered physical

injury as well as embarrassment, humiliation, and psychological injury.

## COUNT IX – FALSE IMPRISONMENT BY
## DEFENDANT CLINE

149. Plaintiff adopts and incorporates paragraphs 1 - 69 as though fully restated and alleged herein.

150. In Florida, false imprisonment is defined as the unlawful restraint of a person against his will.

151. The essential elements of a cause of action for false imprisonment are: (1) the unlawful detention and deprivation of liberty of a person; (2) against that person's will; (3) without legal authority or "color of authority"; and (4) which is unreasonable and unwarranted under the circumstances.

152. In the alternative, if Cline was not acting at the time as an agent of Defendant Sheriff, when Cline did detain and confine S.K. against her will in the back of his police car and facilitated and caused S.K.'s detention and confinement at a Mental Health Detention Center against her will and against the will of her parents and natural guardians, then Cline himself is individually liable for the false imprisonment of S.K.

153. Cline's actions above were done without legal authority since he lacked probable cause.

154. The detainment and confinement of a special needs child, in the manner described above, was unreasonable and unwarranted under any circumstances and certainly unreasonable and unwarranted in the case of an nine-year old, little girl with autism when that child (a) was not mentally ill, (b) posed no real and present threat of substantial harm to her well-being, and (c) when it was made abundantly clear to the officer that any such potential for harm or neglect could be avoided through the help of willing family members, her parents, who requested S.K. be released to them.

22

155. S.K. was aware of her confinement and was unable to escape without the threat of harm.

156. As a direct and proximate result of the Defendants' conduct, S.K. has suffered physical injury as well as embarrassment, humiliation, and psychological injury.

## COUNT X – FALSE IMPRISONMENT BY DEFENDANT ASPIRE HEALTH

157. Plaintiff adopts and incorporates paragraphs 1 - 71 as though fully restated and alleged herein.

158. In Florida, false imprisonment is defined as the unlawful restraint of a person against his will.

159. The essential elements of a cause of action for false imprisonment are: (1) the unlawful detention and deprivation of liberty of a person; (2) against that person's will; (3) without legal authority or "color of authority"; and (4) which is unreasonable and unwarranted under the circumstances.

160. The Florida Mental Health Act, also known as the Baker Act, requires that a minor be examined by physician or a clinical psychologist, or by a psychiatric nurse performing within the framework of an established protocol with a psychiatrist, within twelve hours of arrival at the facility and must thereafter be released or admitted for treatment voluntarily or involuntarily.

161. If an agent of a Mental Health Detention Center determines that involuntary inpatient treatment is deemed necessary, a petition for involuntary services shall be filed in the circuit court.

162. In S.K.'s case, she was not evaluated by any physician or a clinical psychologist, or by a psychiatric nurse performing within the framework of an established protocol with a psychiatrist for more than twenty-four hours after her arrival at the Mental Health

23

Facility.

163. Her parents requested, in person and by telephone, numerous times during that more than twenty-four hour period that their nine-year old daughter be evaluated and released from the Mental Health Detention Center.

164. It was not until S.K.'s parents called the Mental Health Detention Center and threatened to make a police report for kidnapping that S.K. was examined by a qualified individual.

165. S.K. was found not to be a danger to herself or others and was released.

166. No petition for involuntary services was ever filed requesting involuntary services for S.K. and she was therefore never admitted voluntarily or involuntarily for inpatient mental health services.

167. Defendant Aspire Health, through its acting agent employees, unlawfully detained and deprived S.K. of liberty, against her will and the will of her parents, without legal authority, when they held her for more than twelve hours without examining her or releasing her, which was unreasonable and unwarranted under the circumstances since her parents repeatedly requested her examination and release and Florida law required it.

168. S.K. was aware of her confinement and was unable to escape without the threat of harm.

169. As a direct and proximate result of the Defendant's conduct, through its acting agents and employees, S.K. has suffered physical injury as well as embarrassment, humiliation, and psychological injury.

## COUNT XI – NEGLIGENCE AS TO DEFENDANT ASPIRE HEALTH

170. Plaintiff adopts and incorporates paragraphs 1 - 71 as though fully restated and alleged herein.

171. Defendant Aspire Health, through its agents and employees, took custody, care, and

24

responsibility for S.K. as a Baker Act receiving facility and owed S.K. a heightened duty of care as a minor in their mental health facility.

172. Defendant Aspire Health breached its duty of care to S.K. by failing to promptly (within twelve hours) examine S.K. to determine whether she was in need of mental health services or could be released to her parents, which would have mitigated the damage suffered by the child.

173. Defendant Aspire Health's breach of duty owed to S.K. were the proximate cause of S.K.'s injuries and damages as S.K. had to endure more than twenty-four hours, including staying overnight, in a detention facility with mentally ill people where those patients were yelling, making strange sounds, and saying things that were extremely frightening to a nine-year old girl.

174. S.K. suffered emotional damages and physical injuries as a result of Defendant Aspire Health's breach of its duty to S.K.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

**WHEREFORE**, Plaintiff S.K. demands judgment against the Defendants for damages, attorneys' fees, costs, and such other relief as the Court deems just and proper.

Dated: November 25, 2020

Respectfully submitted,

The Orlando Law Group, PL
Attorney for Plaintiff

25

By: ___*/s/Kimberly E. Hosley*_____
Kimberly E. Hosley, Esq.
Florida Bar Number: 015365
The Orlando Law Group, PL
12301 Lake Underhill Rd., Suite 213
Orlando, Florida 32828
Telephone: (407) 512-4394
Fax: (407) 955-4654
E-Mail: khosley@theorlandolawgroup.com
E-Mail 2: rmoyer@theorlandolawgroup.com